**OTTOSON v. WIDSTEAD.**

(Second Division. Nome. November 20, 1920.)

No. 2828.

Account ☞14—Specific Performance ☞68—Equity.

>   Plaintiff purchased 20 head of female reindeer from one Larsen in 1917, who agreed to look after and take care of same for the period of one year. After the death of Larsen demand was made on the administrator of his estate for the female deer and the natural increase, which being denied, a suit for accounting was begun. *Held*, accounting and specific performance the proper remedy, and judgment accordingly.

HOLTZHEIMER, District Judge. This is a bill in equity seeking an accounting between the parties thereto. Courts of equity have jurisdiction to compel an accounting even though the complainant might have an adequate remedy at law, where a fiduciary relation exists or a discovery is sought.

At the outset I am constrained to say that the court has not been materially aided by counsel in this case, by the authorities cited on the one side, and by the lack of authorities covering the bald declaration of law on the other.

Upon a thorough examination of the pleadings and exhibits, and after listening to the evidence, I have come to the conclusion that the proper remedy in this action is an accounting and specific performance. This brings it strictly under the equitable branch of the court, and "equity, having acquired jurisdiction for one purpose, will retain it for all purposes to give full relief."

This being true, equity looks for relief to the exigencies of the case as expressed in that equity maxim, "Equity looks through form to substance," and in doing so accepts the old maxim of equity, viz. "Equity will not suffer a wrong to be without a remedy." This maxim is the foundation of equitable jurisdiction and arose by reason of the inability of the common-law courts to meet the requirements of justice.

Without incumbering the record by setting out in full the pleadings and exhibits, what are the practically undisputed facts in this case? On October 16, 1916, Fred Larsen, now deceased, entered into a written contract under and by virtue

---

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of which Larsen, for and in consideration of a fourteen-fifteenths interest in the schooner Belinda (being on that day delivered to him, Larsen), agreed to turn over to Andy Ottoson 40 female reindeer from his herd then running with what was known as the "Sinrock Mission herd," and was to deliver said 40 head of female reindeer to the said Ottoson on the 10th day of July, 1917. For some reason, which is not material to the issues here, this was not done, but on the 12th day of November, 1917, another written agreement and purported bill of sale was entered into by and between the original parties, which simply changed the terms of the original contract, and which, in view of all the facts and the evidence in the case, shows that, instead of giving him 40 reindeer for said fourteen-fifteenths interest in the Belinda, he (Larsen) would allow Ottoson 20 female reindeer for the use of said schooner and for its depreciation in value caused by reason of wear, tear, and the elements for the past year, turning back to Ottoson the Belinda. The purported bill of sale of reindeer from Ottoson to Larsen, nowithstanding the words of transfer used therein, is not a bill of sale in fact, as there never had been a transfer, either actual or constructive, of any reindeer at that time nor since, and is only material in arriving at the true contract and intent of the parties; in other words, Ottoson had no reindeer to sell.

As a further consideration for the transfer, Larsen agreed to look after and take care of said 20 head of reindeer for the period of one year, using ordinary care and diligence in so doing, not to be responsible, however, for accidents, and so forth, not caused by his negligence.

It is further shown by the pleadings and fully substantiated by the evidence that at the time of the separation of the Larsen herd from said Sinrock Mission herd, to wit, in August or September, 1917, Larsen recognized the contract with Ottoson by branding 40 head of reindeer of his herd with the letter O, which would naturally only last until the following spring, when the reindeer shed their coats. This was not known to Ottoson at the time, and since only from hearsay, but no attempt had been made, either actual or constructive, to make delivery to Ottoson. In fact, Ottoson has never at any time to this date ever seen the reindeer, although he, Ottoson, often requested of Larsen to make transfer by actual de-

livery or placing his permanent brand on them. Ottoson even went so far as to have a branding iron made, but Larsen never seemed to get the time to brand them. Before any transfer could be made so that Ottoson could identify his deer, Larsen died, on November 10, 1918.

On or about December 5, 1918, J. C. Widstead took charge of the Larsen herd, as administrator of the estate of Fred Larsen, deceased. Demand for delivery of the said 20 head of female reindeer and their increase was then made upon said Widstead, administrator. This is admitted by oral agreement in open court; the administrator basing his claim for refusal that he knew nothing about the transaction.

The administrator of the estate of Fred Larsen, deceased, by his answer, on information and belief, denies every material allegation of the complaint with reference to the contracts, but offered no evidence to sustain his position or refute the allegations and proofs of the plaintiff, with one exception, the witness Pete Larsen, who is an heir at law, and whose testimony was impeached and wholly unreliable, and to which the court gave no weight.

The first question to be considered is: Had Larsen lived, what would have been his obligation to Ottoson? Replevin would not lie, as no delivery, either actual or constructive, had ever been made, and it would be impossible to either identify the deer or arrive at the number to be replevined, and I know of no other adequate remedy at law. This being the case, Larsen would have had to account to Ottoson for said 20 head of female reindeer and their increase from the 12th day of November, 1917, to the date of their delivery, and be compelled, after the accounting had been had, to specifically perform his end of the contract by making delivery to Ottoson. Specific performance cannot be had until the number of reindeer Ottoson was entitled to by an accounting was ascertained, and the uncertainty removed.

It would be useless to have any further hearing in this case for an accounting, as, under the testimony at this hearing, the evidence is full and complete, and the accounting had. The testimony of the superintendent of the bureau of education, Evans, who was called as an expert on behalf of the plaintiff, shows without contradiction that, covering the period from the 12th day of November, 1917, to the present

6 A.R.—21

date, there would be 28 adult females, 6 two year old males, 6 one year old males, 12 female fawns, and 8 male fawns, or a total of 60 reindeer. This must be taken as accurate, as it has not been disputed in any particular. The only attempt to discredit this testimony was the cross-examination of Mr. Evans by the attorney for the defendant with reference to what might have happened, as follows:

"By Mr. O'Neill:  Q. As a matter of fact conditions have been anything but favorable in the last three years in the reindeer industry between Cripple river and Nome river, that is a fact?  A. They have not been favorable; no.

"Q. And as a result of unfavorable conditions there are numerous wild deer belonging to natives, the Larsen and Lomen herds, and everybody else, isn't that a fact?  A. Yes, sir.

"Q. You know that to be a fact?  A. Yes, sir.

"Q. And the hills are just alive with mavericks?  A. I would not say 'alive' with mavericks; I would say a good many.

"Q. Do you consider the last few years favorable years?  A. I would not consider them favorable years.

"By the Court:  Q. What did you say would be the natural increase of that number, 20; what would it be at this time?  A. The total would be 60."

There is no evidence on the part of the defendant that he lost any deer by reason of unfavorable weather, killed, strayed or stolen, or that he used reasonable care to prevent any such loss. On the contrary, the evidence plainly shows a total lack of care, and when asked about the herd he did not know how many he had, nor could he even give an estimate. And, in the language of counsel for the defense, "It would be improper for the court to guess at any fact," especially as to the increase, so the court, without any proof, will not attempt to guess what might have happened, by finding that any number might have been killed or lost by unfavorable weather, or had strayed or been stolen.

Now what is the position of Widstead, the administrator of the estate of Fred Larsen, deceased?

I take it, and so find, that there has been imposed upon him, by law, an implied or resulting trust to do that which Fred Larsen would have been compelled to do had he lived, that is:

First. To account to Ottoson for the number of reindeer he would be entitled to, viz. a total number of 60 head of reindeer as previously set forth in this opinion.

Second. This accounting having been had, to specifically perform the contract by delivering to said Ottoson the number thus found, to wit, 60 head of reindeer.

In view of all the evidence and the law, findings, conclusions of law and decree may be prepared in accordance with the views expressed herein.

&#9740;See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes